**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NADYA KARAFEZIEVA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 15 C 1186** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Nadya Karafezieva seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be reversed or remanded. The Commissioner responded with arguments in support of upholding the decision. After careful review of the record, the Court agrees with Plaintiff that the case must be remanded for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on July 13, 2011 alleging that she became disabled on December 31, 1995 due to high blood pressure and panic attacks. (R. 137, 159). The Social Security Administration denied her application initially on November 29, 2011, and again upon reconsideration on April 10, 2012. (R. 65-71, 76-79). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Judith S. Goodie (the "ALJ") on March 28, 2013. (R. 46). The ALJ heard testimony from Plaintiff,

who was assisted by an interpreter and a non-attorney representative, and from vocational expert Julie L. Bose (the "VE"). (*Id.*).

Shortly thereafter, on May 7, 2013, the ALJ denied Plaintiff's claim for SSI benefits, finding that she is capable of performing a significant number of jobs available in the national economy. (R. 26-41). The Appeals Council granted Plaintiff's request for review, at which point she retained counsel and had an opportunity to submit new evidence to support her claim. (R. 132-35). On December 18, 2014, the Appeals Council affirmed the ALJ's decision to deny benefits, and Plaintiff now seeks judicial review under 42 U.S.C. § 405(g). (R. 4-6).

In support of her request for reversal or remand Plaintiff argues that: (1) the Appeals Council failed to properly consider the opinion from State agency psychiatrist Kenneth M. Levitan, M.D., resulting in a flawed residual functional capacity ("RFC") assessment; (2) the Commissioner did not develop the record as required for an unrepresented claimant; and (3) the Commissioner erred in evaluating Plaintiff's statements regarding the severity of her symptoms. As discussed below, the Court finds that the mental RFC determination is not supported by substantial evidence, and the case must therefore be remanded.

## BACKGROUND

Plaintiff was born in Bulgaria on July 24, 1952, was 60 years old at the time of the administrative hearing and the ALJ's decision, and 62 years old at the time of the Appeals Council's decision. (R. 137). She graduated from high school in Bulgaria and has a college degree in international tourism. (R. 51, 159). After moving to the U.S. in 2002, she also completed schooling as a nursing assistant but never found a job in that

field.  Now a naturalized U.S. citizen, Plaintiff lives alone in a church facility and has some ability to speak and understand English.  (R. 51, 137, 147, 160).  Her daughter and young granddaughter live nearby.  There is no record of Plaintiff working in the U.S., but it appears that she spent 19 years as a currency exchange border clerk in Bulgaria until hotels in the area shut down and the Communist government ended.  (R. 51, 54, 233).

A.      **Medical History**

      1.      **2010**

The first available medical record is from September 28, 2010 when Plaintiff saw Roseann Gager, M.D., at John H. Stroger, Jr. Hospital of Cook County ("Cook County Hospital") for medication refills.  Plaintiff reported having surgery on July 22, 2010 due to a hallux abducto valgus (bunion) on her right foot, but had no associated complaints. Dr. Gager diagnosed borderline hypertension ("HTN"), and instructed Plaintiff to continue her current medication (unidentified) and return in two months.  (R. 231).  Less than two weeks later, on October 8, 2010, Plaintiff went back to Dr. Gager seeking refills of diazepam (Valium), which she said she had been taking for anxiety since living in Bulgaria.  (R. 230).  Dr. Gager diagnosed anxiety and told Plaintiff to consider a psychiatric consultation.  She also determined that Plaintiff's HTN was uncontrolled and increased her dosage of a medication called enalapril.  (*Id.*).

Plaintiff next saw Dr. Gager on November 24, 2010 for medication refills.  Her HTN was controlled at that time and her anxiety had improved with diazepam.  Plaintiff declined a psychiatric consultation and Dr. Gager instructed her to return in 3 months. (R. 229).

## 2.    2011

Approximately 6 months later, on May 25, 2011, Plaintiff went back to Dr. Gager for another medication refill.  She had no complaints and a mental status examination showed appropriate mood and affect with normal judgment.  (R. 224).  Dr. Gager diagnosed Plaintiff with HTN that was "[n]ot well controlled," and anxiety disorder, not otherwise specified, that was "[w]ell controlled."  (R. 226).  Dr. Gager instructed Plaintiff to continue taking diazepam as needed and return in one month.  (R. 227).  There is no record that Plaintiff saw Dr. Gager as scheduled, but she did apply for disability benefits on July 13, 2011.

On September 26, 2011, Plaintiff started seeing Suraj Pazhoor, M.D., at Cook County Hospital.  She complained of ongoing depression and sobbing, and said that when she got upset she panicked and took extra blood pressure medication.  (R. 220). The treatment note reflects that Plaintiff was taking a variety of medications at that time, including Elavil (amitriptyline) for depression, diazepam for anxiety, and enalapril and metoprolol for HTN.  (R. 220-21).  Dr. Pazhoor diagnosed uncontrolled HTN and increased the metoprolol dosage.  (R. 221).  He also diagnosed stable depression, added sertraline (Zoloft) to Plaintiff's medication regimen, and referred her for a psychiatric evaluation.  (R. 222).

A few days later, on October 1, 2011, Kenneth M. Levitan, M.D., performed a psychiatric evaluation of Plaintiff for the Bureau of Disability Determination Services ("DDS").  (R. 232-35).  Plaintiff told Dr. Levitan that she can speak and understand English but not read or write it very well.  She complained of anxiety since moving to the U.S. in 2002, depression for the previous 5 years, and panic attacks occurring once a

month, each lasting approximately 20 minutes. (R. 232). Though Plaintiff reported getting along with other people, she denied having any friends. (R. 233). With respect to daily activities, Plaintiff said she went to the store, occasionally cooked, cleaned her apartment and bathed. (R. 234).

On examination, Dr. Levitan observed that Plaintiff "related in a very sad and anxious way," and though she was "controlled at first," she became "increasingly more upset in a dramatic-like way as the interview progressed." (*Id.*). She spoke and understood basic English but Dr. Levitan had to repeat himself often and simplify things for her. Plaintiff exhibited difficulty concentrating, fair recent and remote memory, limited insight into her problems, and good judgment. Dr. Levitan had trouble assessing her ability to think abstractly because English is not her native language, but said she appeared to have "an about average intelligence." (*Id.*).

Based on his evaluation, Dr. Levitan diagnosed Plaintiff with mixed anxiety-depression, noting that he could not rule out major depression. He opined that Plaintiff can perform "simple and routine tasks"; "would have difficulty handling regular work pressure and stress"; can "communicate in basic ways with co-workers and a supervisor"; and can "follow, understand, and retain simple instructions in English." (R. 234-35). Dr. Levitan indicated that Plaintiff would benefit from outpatient psychiatric care and antidepressant medications. (R. 234).

On October 12, 2011, Richard J. Hamersma, Ph.D., completed a Psychiatric Review Technique of Plaintiff for DDS. (R. 236-48). He found that Plaintiff has mixed anxiety-depression that causes mild restriction in activities of daily living; mild difficulties in maintaining concentration, persistence or pace; and no difficulties in maintaining

social functioning.  (R. 241, 246).  The following month, on November 8, 2011, Liana G. Palacci, D.O., performed an Internal Medicine Consultative Examination of Plaintiff for DDS.  (R. 250-53).  Plaintiff described a history of HTN diagnosed 15 years earlier, and a history of depression and panic disorder diagnosed 5 year earlier.  (R. 250-51).  She reported seeing a psychiatrist once a month (this is not supported by the medical record), taking sertraline for depression, and experiencing frequent crying spells and 2 panic attacks per week.  (R. 251).  Plaintiff's physical examination was normal, (R. 251-52), and her mental examination showed normal memory, fund of knowledge, ability to perform calculations, judgment and affect.  (R. 252).  She was also "able to relate a clear, concise, coherent medical history without apparent cognitive difficulties."  (*Id.*).  Dr. Palacci diagnosed well-controlled HTN and history of depression and panic disorder.  (R. 252-53).

On November 29, 2011, consultative examiner Vidya Madala, M.D., reviewed Plaintiff's medical record for DDS and determined that her HTN is not a severe impairment and has no more than a minimal effect on her ability to perform basic work activities.  (R. 254-56).  Charles Wabner, M.D., affirmed this determination in early April 2012.  (R. 264).

### 3.    2012

Plaintiff returned to Dr. Pazhoor on January 20, 2012 for a scheduled follow-up visit.  (R. 258-59).  Dr. Pazhoor diagnosed well-controlled HTN and depression, and instructed Plaintiff to start taking Elavil at bedtime to help with sleep and anxiety issues.  (R. 260).  Shortly thereafter, on March 14, 2012, Plaintiff started seeing Annamma J. Mathew, CNP at Cook County Hospital for psychiatric treatment of depression and

panic attacks. (R. 301). Plaintiff told Dr. Mathew that she woke up frequently throughout the night and never got more than 4 or 5 hours of sleep even with amitriptyline. (R. 302). She reported that her most recent panic attack occurred 1.5 months earlier following an argument with a store cashier, and resulted in shortness of breath, palpitations, and chest pain. (*Id.*). She also described having no interests, feeling hopeless and disappointed, not liking to be around noise or people, and suffering from low energy, poor concentration and feelings of guilt. (*Id.*).

On examination, Plaintiff exhibited linear and goal-oriented thought process, good insight, fair judgment, and normal speech, with no psychomotor agitation or retardation, but her mood was "not good" and her affect was depressed. (R. 303). Dr. Mathew diagnosed Plaintiff with panic disorder and assigned her a GAF score of 41-50.[1] In addition to altering her medication regimen (increasing the sertraline, discontinuing amitriptyline, and adding trazodone), Dr. Mathew scheduled Plaintiff for a follow-up visit in 6 weeks. (R. 304).

When Plaintiff saw Dr. Mathew on April 24, 2012, she reported decreased symptoms of depression but was worried about her daughter's visa status. (R. 297). The diazepam still helped with anxiety, but the trazodone was not enabling her to stay asleep. (R. 297-98). On examination, Plaintiff was cooperative with good eye contact,

---

[1] "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)). "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011). In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity … and questionable psychometrics in routine practice.'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting DSM 16 (5th ed. 2013)).

linear speech, and appropriate affect. Her mood was "alright" and she exhibited good attention, concentration, insight and judgment. (R. 299). Dr. Mathew assigned Plaintiff a GAF score of 41-50, and told her to stop taking trazodone for sleep and start using Ambien (zolpidem) instead. (*Id.*).

Plaintiff returned to Dr. Pazhoor in May and June 2012 for scheduled follow-up exams. At the appointment on May 22, Plaintiff said her depressive symptoms were "much better" with the sertraline and she had no other issues. (R. 322). Plaintiff likewise reported no new complaints during her next visit on June 18. (R. 325). Dr. Pazhoor determined that Plaintiff's HTN was "[p]rogressing as expected," and instructed her to follow up with the psychiatrist regarding her depression. (R. 323, 325-26). When Plaintiff saw Dr. Mathew on July 24, 2012, she said she was feeling depressed sometimes and was increasingly worried about her daughter's visa status, but Ambien helped her sleep and she continued to take diazepam as needed to decrease anxiety. (R. 293). Dr. Mathew assessed continued depressed mood and anxiety, increased the dosage of sertraline, and assigned Plaintiff a GAF score of 41-50. (R. 293-94).

On October 16, 2012, Plaintiff returned to Dr. Mathew for a follow-up exam and medication refills. Plaintiff brought her granddaughter to the appointment and told Dr. Mathew that she was "baby sitting to help [her] daughter." (R. 290). She also reported doing better with no significant psychiatric complaints, and said she was sleeping well with medication and not experiencing any side effects. (R. 291-92). Dr. Mathew kept Plaintiff's GAF score at 41-50, described her mood as stable, maintained her on the same medication regimen, and instructed her to return in 3 months. (R. 290-91).

### 4. 2013

During a family practice exam at Cook County Hospital on January 10, 2013, Plaintiff said she was still very depressed with high anxiety, but was looking forward to "her court date for disability." (R. 334). Five days later, on January 15, 2013, Plaintiff told Dr. Mathew that she was "doing better" and sleeping well, with no medication side-effects or significant psychiatric complaints. (R. 338). She was still babysitting her granddaughter, who came with her to the exam. (*Id.*). On examination, Dr. Mathew described Plaintiff's mood as "better," found her affect appropriate, and said she exhibited good attention, concentration, insight and judgment. Dr. Mathew decreased Plaintiff's zolpidem dosage, increased her diazepam dosage, and instructed her to return in 3 months. (R. 339).

On January 26, 2013, Plaintiff went to Norwegian American Hospital for a nosebleed (epistaxis) and syncope (fainting). (R. 314). Four days later, on January 30, 2013, she had another nosebleed and went to Cook County Hospital. (R. 341, 347). The last available record is from March 27, 2013, when Plaintiff went back to Cook County Hospital for a follow-up regarding her nosebleeds. (R. 367).

### B. Plaintiff's Testimony

Plaintiff testified at the hearing that she has a college degree in tourism and also completed school to become a nurse's assistant. (R. 51). She lives alone in a small apartment and reported being able to use public transportation by herself up until the time her nosebleeds started in January 2013. (R. 51-52). Though the nosebleeds have stopped, she is afraid "it may occur again." (R. 52-53). Plaintiff testified that she is unable to work because she is afraid "to do a mistake, . . . to insult someone." (R. 55).

She also gets "so excited or upset" and experiences panic attacks 4 to 5 days a week that cause tightness and pain in her chest and leave her incapable of doing anything for the entire day.  (R. 55-56).

## C.  Administrative Law Judge's Decision

The ALJ found that Plaintiff's mixed anxiety-depression is a severe impairment, but that it does not alone or in combination with other non-severe impairments meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 28-36).  After reviewing the medical record and testimonial evidence, the ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels, as long as she is limited to simple, routine, repetitive tasks, with no more than brief, superficial contact with the general public and only occasional contact with co-workers.  Plaintiff can tolerate "only changes in a routine work setting," and cannot work "at a production rate pace" or meet strict production quotas.  (R. 37).

In reaching this conclusion, the ALJ accorded moderate weight to Dr. Hamersma's October 12, 2011 opinion that Plaintiff has mild restrictions in activities of daily living, but "less weight" to his opinion that she has no or only mild restrictions in social functioning and concentration, persistence or pace.  As the ALJ explained, Plaintiff's testimony that she is preoccupied with a fear of people supported a finding of moderate restrictions in those areas.  (R. 39).  Despite discussing Dr. Levitan's assessment in detail, (R. 29-30), the ALJ failed to assign his opinion any specific weight.  Instead, she gave great weight to the opinions from the non-examining consultants, Dr. Madala and Dr. Wabner.  (R. 39).  As for Plaintiff's testimony, the ALJ found her "not entirely credible" because she overstated her limitations in speaking

English, understated the extent to which she babysat for her granddaughter, and exhibited an ability to engage in a broad range of activities of daily living. The ALJ also cited to medical records reflecting that Plaintiff's depression and anxiety improved with medication. (R. 37-38).

Based on these findings, the ALJ accepted the VE's testimony that Plaintiff is capable of performing a significant number of jobs available in the national economy, including laminator (5,800 jobs available), laundry worker (11,800 jobs available), and cleaner #2 (5,000 jobs available). (R. 40). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act and is not entitled to benefits. (*Id.*).

### D. Appeals Council Decision

The Appeals Council ("AC") granted Plaintiff's request for review of the ALJ's decision, largely due to the ALJ's failure to assign weight to Dr. Levitan's opinion, and gave Plaintiff an opportunity to submit new evidence. (R. 132-35). Plaintiff retained counsel who prepared two briefs in support of her appeal. (R. 214-18).

The AC ultimately affirmed the ALJ's decision in full, agreeing that Plaintiff can perform work at all exertional levels with the following restrictions: she can "follow simple instructions in English"; she is "limited to simple, routine, repetitive tasks, with brief, superficial contact with the general public, and only occasional contact with co-workers"; she can "tolerate only changes in a routine work setting"; and she cannot work "at a production rate pace" or "meet strict production quotas." (R. 5-6). In making this determination, the AC gave "significant weight" to Dr. Levitan's opinion, which the ALJ used "partly as the basis in formulating the [RFC]." (R. 5). The AC also adopted the

ALJ's conclusions concerning Plaintiff's subjective complaints, finding them "not fully credible," and determined that she can perform a significant number of jobs available in the national economy. (R. 5-6).

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  42 U.S.C. § 1382c(a)(3); *Warren v. Colvin*, No. 14 C 1622, 2015 WL 5081586, at *10 (N.D. Ill. Aug. 27, 2015); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011).  A person is disabled if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently engaged in substantial gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 416.920; *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

**C.     Analysis**

Plaintiff argues that this case must be reversed or remanded because (1) the Appeals Council failed to properly consider Dr. Levitan's opinion, resulting in a flawed RFC assessment; (2) the Commissioner did not develop the record as required for an unrepresented claimant; and (3) the Commissioner erred in evaluating Plaintiff's statements regarding the severity of her symptoms.

### 1.    Dr. Levitan's Opinion

Plaintiff claims that despite giving "significant weight" to Dr. Levitan's opinion, the AC inexplicably ignored important limitations he imposed on her ability to work.  (Doc. 14, at 8; Doc. 22, at 3).[2]  Dr. Levitan found that Plaintiff

> could perform simple and routine tasks.  She would have difficulty handling regular work pressure and stress.  She could communicate in basic ways with co-workers and a supervisor.  She could follow, understand, and retain simple instructions in English.

(R. 134-35).  Based in large measure on these findings, the AC determined that Plaintiff has the RFC to

> follow simple instructions in English.  She is limited to simple, routine, repetitive tasks, with brief, superficial contact with the general public, and only occasional contact with co-workers.  She can tolerate only changes in a routine work setting, and should not be required to work at a production rate pace or to meet strict production quotas.

(R. 6).

### a.    Difficulties with Stress and Supervisors

Plaintiff first argues that the stated RFC fails to account for her difficulties handling work pressure and stress, including interacting with supervisors.  SSR 85-15 recognizes that determining whether an individual suffering from a mental illness "will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult." SSR 85-15, at *5.  Though there are no "presumptive limitations for disorders," an RFC assessment must reflect any "impairment-related limitations created by an individual's response to demands of work."  *Id.*  In that regard, SSR 85-15 requires an ALJ to "undertake a subjective, individualized inquiry into what job attributes are likely to

---

[2]    For ease of reference, unless otherwise specified, page numbers for all briefs are drawn from the CM/ECF docket entries at the top of the filed document.

produce disabling stress in the claimant, and what, if any, jobs exist in the economy that do not possess those attributes." *Clark v. Colvin*, No. 1:14-CV-00834-TWP-DKL, 2015 WL 2342146, at *4 (S.D. Ind. May 14, 2015) (quoting *Felver v. Barnhart*, 243 F. Supp. 2d 895, 906 (N.D. Ind. 2003)).

The Commissioner argues that the AC incorporated several limitations into the RFC that address Dr. Levitan's opinion that Plaintiff has difficulties handling stress:  she can only perform simple, routine, repetitive tasks; she can tolerate only changes in a routine work setting; she can have only brief, superficial contact with the general public and occasional contact with co-workers; and she should not be required to work at a production rate pace or to meet strict production quotas.  (R. 5; Doc. 21, at 4-5). Similarly, the ALJ determined that Plaintiff needs "a work environment with reduced stress" due to fear of other people, and is therefore limited to "a predictable work environment, with only occasional changes in the routine work setting, occasional contact with co-workers, and work tasks that she may perform at her own pace without being required to meet strict production quotas."  (R. 39).

The primary problem with this RFC is that it says nothing about Plaintiff's ability to interact with supervisors.  The ALJ credited Plaintiff's testimony that she has a "fear of strangers" and is "preoccup[ied] with her fear of people," and so "reduce[d] [her] workplace interactions with the public and coworkers."  (R. 38-39).  There is no explanation from either the ALJ or the AC, however, for why Plaintiff does not have any similar problems interacting with supervisors, or why co-workers would be considered "strangers" but supervisors would not.  (Doc. 21, at 5, 7-8).  *See Young v. Barnhart*, 362

F.3d 995, 1004 (7th Cir. 2004) (restriction to limited contact with the public and co-workers did not address problems interacting with supervisors).

The Commissioner responds that Plaintiff does not have problems with supervisors as evidenced by Dr. Levitan's observation that she can communicate with them in basic ways. (Doc. 21, at 7). Of course, Dr. Levitan also found Plaintiff capable of communicating with co-workers, so this does not explain the decision to limit contact with co-workers and not supervisors. The Commissioner is correct that the restrictions on workplace interactions go beyond those articulated by Dr. Levitan, who merely cautioned generally about difficulties with workplace stress. (*Id.* at 5). But this highlights another problem with the AC's decision: it is not clear what Dr. Levitan meant by the term "stress," or what functional limitations Plaintiff has as a result. Since the case must be remanded for further evaluation of Plaintiff's ability to interact with supervisors, the AC should also consider re-contacting Dr. Levitan to clarify whether Plaintiff has any other stress-related limitations affecting her ability to work.

### b.    Communication in English

Plaintiff also objects that the RFC failed to include a limitation reflecting her inability to communicate in English. (Doc. 14, at 11). On this point, the Court finds no error. Consistent with Dr. Levitan's opinion, both the ALJ and the AC found that Plaintiff can follow only simple instructions in English, and the ALJ expressly incorporated that limitation into the hypothetical question posed to the VE. (R. 6, 37, 62, 234-35). Plaintiff says this is inadequate because the AC and the ALJ also determined that she is "unable to communicate in English" and "illiterate" in that language. (R. 6, 40). "At a

minimum," she says, such "internally inconsistent findings . . . render the decision legally insufficient."  (Doc. 22, at 6).  The Court disagrees.

The ability to speak, read and understand English is "an educational factor" relevant to determining what work, if any, a claimant can perform.  20 C.F.R. § 416.964(b)(5).  A person is considered to be illiterate in English if she "cannot read or write a simple message such as instructions or inventory lists even though [she] can sign . . . her name."  20 C.F.R. § 416.964(b)(1).  *See also Leffingwell v. Colvin*, No. 1:15-CV-00015-TWP-MJD, 2016 WL 890552, at *6 (S.D. Ind. Mar. 9, 2016).  Plaintiff's inability to read or write in English, and difficulties communicating in that language, are not inconsistent with a finding that she can still follow simple instructions in English as Dr. Levitan determined.  As the ALJ noted, Plaintiff testified that she understands some English, and she routinely attended medical appointments and managed to communicate with her physicians despite the language issues.  (R. 37, 51).  (*See also* R. 252) (Dr. Palacci's November 8, 2011 note stating that Plaintiff was "able to relate a clear, concise, coherent medical history.").  This aspect of the Commissioner's decision is supported by substantial evidence.

### 2.  Duty to Develop the Record

Plaintiff next argues that the Commissioner committed reversible error by failing to properly develop the record.  (Doc. 14, at 11-12).  Since Plaintiff was unrepresented by counsel at the administrative level, the ALJ needed to obtain a valid waiver of representation.  *Skinner*, 478 F.3d at 841.  The Commissioner concedes this did not occur.  (Doc. 21, at 8).  As a result, the Commissioner now bears the burden of demonstrating that the ALJ adequately fulfilled her duty to "develop a full and fair

record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).  This duty to develop is heightened in the absence of a valid waiver, meaning the ALJ must "'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'"  *Id.* (quoting *Thompson v. Sullivan,* 933 F.2d 581, 585-86 (7th Cir. 1991)); *Million v. Astrue*, 260 F. App'x 918, 921 (7th Cir. 2008).  As the Seventh Circuit explains, this includes "supplement[ing] the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information."  *Id.* (citing 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3)).

At the same time, "it takes 'a significant omission … before [a] court will find that the [Commissioner] failed to assist pro se claimants in developing the record fully and fairly.'"  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1143 (N.D. Ill. 2012) (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)).  For this reason, "[t]he Seventh Circuit holds that the ALJ has not failed to adequately develop the record where the claimant does not show they were prejudiced by a lack of development."  *Miller v. Colvin*, No. 11 C 50141, 2014 WL 2708387, at *11 (N.D. Ill. June 11, 2014) (citing *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009)).  "'Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.'"  *Moore*, 851 F. Supp. 2d at 1143 (quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994)).

As stated earlier, the Court recommends that the AC consider re-contacting Dr. Levitan to clarify the nature and extent of Plaintiff's stress-related limitations.  This will address any concerns Plaintiff has regarding the duty to develop evidence on that issue.

The Court finds no error, however, in the ALJ's analysis of Plaintiff's back and right ankle pain, difficulty lifting objects, and medication side-effects, including frequent urination. Not a single doctor opined that Plaintiff would have any functional limitations associated with these issues. Dr. Palacci observed that Plaintiff has normal range of motion in her shoulders, elbows, wrists, knees, hips, spine, and ankles, can walk without assistance, and can even perform knee squats. (R. 252). Plaintiff said nothing about urinary frequency during the examination, and Dr. Palacci's only physical diagnosis was well controlled HTN. (*Id.*). State agency consultants Dr. Madala and Dr. Wabner similarly found that Plaintiff's HTN (her only medically determinable impairment) has no more than a minimal effect on her ability to perform basic work activities. (R. 256, 264).[3]

Plaintiff insists that the ALJ still should have asked her more questions about her use of pain medication and problems with urinary frequency. Plaintiff reported in her July 2011 Function Report that two of her HTN medications (enalapril and hydrochlorothiazide) make her urinate often, (R. 183), and she testified at the hearing that her medication side effects include stomach pain, nausea, dizziness and fatigue, and that she could not increase her dosage of one unidentified medication due to "a side effect to my kidneys." (R. 57, 59). At the same time, Plaintiff affirmatively denied experiencing any medication side effects when she saw Dr. Mathew in October 2012 and January 2013, (R. 290, 338), and none of the medical records reflects any such complaints. More importantly, Plaintiff retained experienced counsel once her case

---

[3] Plaintiff states in cursory fashion that the AC failed to adequately weigh the opinions from these reviewing physicians. (Doc. 14, at 9 n.10; Doc. 22, at 7). This argument is unavailing because the AC clearly considered the opinions, (R. 5), and the ALJ assigned "great weight" to the findings that Plaintiff "has no severe physical impairment." (R. 39).

proceeded to the AC level, but he failed to present any new evidence or testimony regarding her medication use or associated side effects. (R. 214-18). The Court is thus satisfied that the Commissioner has met her burden of showing that the ALJ and the AC together fulfilled all required duties to develop the record concerning Plaintiff's physical impairments and medication side effects.

### 3.    "Credibility" Determination

Plaintiff finally argues that the ALJ erred in finding her testimony "not fully credible." (Doc. 14, at 12). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2.[4] If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective

---

[4]    The Social Security Administration recently updated its guidance for evaluating symptoms in disability cases. SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016, 2016 WL 1237954). The new ruling supersedes SSR 96-7p and eliminates the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Since the regulation merely clarifies rather than changes existing law, it is appropriate to evaluate Plaintiff's credibility argument in light of the new guidance. *Lockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016). *See also Estes v. Colvin*, No. 14 C 3377, 2016 WL 1446218, at *6 (N.D. Ill. Apr. 11, 2016).

complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

As a preliminary matter, Plaintiff objects to the ALJ's use of language the Seventh Circuit has criticized as "meaningless boilerplate." (Doc. 14, at 13-14) (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). The use of such boilerplate language will not alone provide a basis for remand, however, as long as "the ALJ said more" and gave reasons for discounting the plaintiff's statements regarding the severity of her symptoms. *Jackson v.* Colvin, No. 12 C 1324, 2013 WL 1499010, at *5 (N.D. Ill. April 11, 2013) (citing *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012)). *See also Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) ("[T]he use of boilerplate is not a ground to remand if the ALJ justified his credibility assessment based on the evidence.").

Here, the AC and ALJ provided several reasons for finding Plaintiff's stated symptoms inconsistent with the evidence, including: (1) despite needing an interpreter to fully understand the hearing, she was able to communicate with her doctors in English; (2) she denied ever being left alone with her granddaughter, but Dr. Mathew's notes reflect otherwise; (3) the record indicates that her activities of daily living are not as limited as she stated at the hearing; and (4) the medical records conflict with her statements about the severity of her symptoms. (R. 5, 37-39). The Court finds no specific error with respect to this portion of the ALJ's analysis, but Plaintiff's statements should be reevaluated in light of any changes to her RFC determination.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request for remand is granted.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: August 4, 2016

SHEILA FINNEGAN
United States Magistrate Judge